VINCENT CORTESE, on behalf of himself and all
others similarly situated,

                    Plaintiff,

              **MEMORANDUM & ORDER**

     - against -              04-CV-956 (DRH) (ARL)

EDGE SOLUTIONS, INC.,

                  Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**A P P E A R A N C E S :**

**LAW OFFICES OF JAMES D. SMITH, LLC**
Attorneys for Plaintiff
2820 7th Street
Tuscaloosa, Alabama 35401
By: James D. Smith, Esq., Leon Storie, Esq.

**LAW OFFICE OF MICHAEL J. REGAN**
Attorneys for Defendant
200 Railroad Avenue
Sayville, New York 11782
By:  Michael J. Regan, Esq.

**HURLEY, District Judge:**

*INTRODUCTION*

Plaintiff Vincent Cortese brought the present putative class action against Defendant Edge Solutions, Inc. ("Edge"), alleging various violations of the federal "Credit Repair Organization Act" and the New York General Business Law, as well as breach of contract.  Edge has moved to stay or dismiss the action and to compel arbitration, pursuant to the Federal Arbitration Act and Federal Rule of Civil Procedure 12(b)(6).  Cortese has moved

for permission to submit an excess-length memorandum in opposition to Edge's motion. For the reasons that follow, Edge's motion is denied, and Cortese's motion is denied as moot.

*BACKGROUND*

According to the Complaint, Cortese is a California resident "in the wholesale and retail clothing business." In early 2001, facing "mounting unsecured debts" due to a business downturn, Cortese contacted Edge, a credit repair organization based in Suffolk County, New York. On February 26, 2001, Cortese signed what Edge calls a "Debt Melt Down Program Agreement Letter" (the "Agreement").[1]

According to this purported contract between the parties, Edge was to "utilize [its] best efforts to negotiate a reduction in the principal balance of [Cortese's] credit obligations," in return for a "fee of 40% (forty) of the actual savings realized by [Cortese] through these negotiations." Cortese agreed to "put aside" (that is, have Edge automatically deduct) $500 from his bank account each month "for the purpose of paying debt as outlined herein within these program parameters as well as fees designated for Edge Solutions, Inc. as described in this agreement." This money, the Agreement states, "will be maintained in a bank account in your name at National Penn Bank in Boyertown, Pa.," to be established "within 60 days following the third payment into the program." Edge was to administrate the account. The Agreement notes that $49.95 of each monthly payment would not be used to pay down debt,

---

[1] There is no indication that Edge actually signed this "letter" as well; however, neither party raises this as an issue or appears to dispute the fact that Cortese and Edge agreed to participate in the "Debt Melt Down Program."

but rather to fund Cortese's participation in Edge's "Debt Free Life Membership and Coaching Program." The first two months' deductions were to be held by Edge as a retainer, refundable "only upon successful completion of the program." The Agreement further states that it may be "severed" at any time upon written notice, at which point "[a]ll funds maintained in the program bank account . . . will be returned to you, less any fees due at that time," except that "the retainer held by Edge Solutions, Inc. will be kept for services rendered."

> The penultimate paragraph of the Agreement states in full:
>
> In The [sic] event of any claim, dispute or controversy between the parties hereto and relating to the validity, construction, performance, breach or termination of this Agreement or otherwise, both parties agree to submit such claim, dispute or controversy to arbitration in Suffolk County, New York in accordance with the rules of the American Arbitration Association ("AAA"). The Arbitrator shall be selected by the mutual agreement of the parties and shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement, including but not limited to any claim that all or in any part of this Agreement is void. The arbitrator's decision shall be final and binding upon the parties.

It is unclear whether any additional documents or agreements were sent or signed by the parties.

According to the Complaint, "[s]hortly after entering into the program, [Cortese] became dissatisfied with Edge Solutions' services." Specifically, Edge Solutions allegedly "failed to timely finalize settlement proposals made by [Cortese's] creditors, thereby causing [him] to pay sums greater than those offered by the creditors." Additionally, alleges Cortese, he "has not received a single benefit from the 'Debt Free Life Membership and Coaching Program' despite paying in excess of $1,300 in monthly fees for said program."

On March 5, 2004, Cortese filed the present claim individually and as a class action on behalf of other similarly situated Edge customers. Cortese claims that Edge violated two provisions of the Credit Repair Organization Act ("CROA"), 15 U.S.C. § 1679 et seq.: (1) Section 1679-b(b), which states that "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed"; and (2) Section 1679-c, which mandates that a credit repair organization must provide any consumer with a specific written statement before any contract or agreement between them is executed. Cortese argues that Edge violated and continues to violate the former provision because its "uniform business practice is to charge fees, labeled as a 'retainer' in the contract, in advance of performing services." Cortese also alleges that Edge violated and continues to violate the latter provision because it "fails to provide consumers with the above referenced disclosure as a matter of routine business practice."

Cortese also claims that Edge violated two provisions of New York's General Business Law ("NYGBL"): (1) Section 458-c and 458-d, which together mandate that a specific disclosure statement be issued by any "credit service business" and signed by its consumer prior to the execution of a contract between them; and (2) Section 349(a), which outlaws "any deceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state." Cortese claims that Edge "fails to provide consumers with the above referenced disclosure as a matter of routine business practice," in violation of the former statute; and that "Edge Solutions' uniform business practice is to

4

deceive consumers into believing that, upon payment of $49.95 per month they will receive various benefits in the "Debt Free Life Membership and Coaching Program" with no intention or ability to provide any of said services," in violation of the latter statute, as well as New York contract law.

Edge filed the present motion on September 3, 2004.

## *DISCUSSION*

I. *Edge's Preliminary Arguments Are Irrelevant; Cortese's Motion To File an Excess-Length Memorandum Is Denied as Moot.*

As an initial matter, Edge's Reply Memorandum argues that this Court should refuse to consider Cortese's memorandum of law in opposition to its motion, because Cortese's submission of a 26-page memorandum violated both this Court's Individual Practice Rules and this Court's June 15, 2004 Order — both of which call for memoranda of no more than twenty pages. Edge also asserts that Cortese has failed to abide by this Court's Individual Rules "requir[ing] that all memoranda of 10 pages or more shall contain a table of contents." Cortese, for his part, has moved this Court to consider his memorandum despite its excess length. The Court will assume *arguendo* that it should deny Cortese's motion, strictly enforce its procedural rules as per Edge's urging, and consider *only* the first ten pages of Cortese's memorandum. But because those ten pages contain sufficient arguments and legal authority to deny Edge's underlying motion to stay or dismiss the complaint, neither Edge's arguments nor Cortese's motion have any bearing on the outcome of this case. They are therefore respectively disregarded as irrelevant, and denied as moot.

Edge's Reply Memorandum also asserts that the germane question in this case is whether the arbitration clause alone is enforceable, and states that (1) "[t]here are no allegations in the complaint that relate specifically to the arbitration clause," (2) Cortese has failed to submit an affidavit from a person with knowledge of the facts relevant to determination of this motion, and (3) "[i]t is inherently unfair to Defendant to have to respond to Plaintiff's papers without . . . knowing what the Plaintiff [plans to] allege." This argument is also irrelevant in the present case. Contrary to Edge's assertions, the factual allegations that Cortese *has* included in his complaint *are* in fact germane to — and dispositive of — Edge's motion. *See* Part II.B, *infra*. Cortese's purported failure to timely serve any sort of affidavit is thus immaterial.

II. *Edge Is not Entitled To Stay or Dismiss This Case in Favor of Arbitration.*

    A. *The Federal Arbitration Act, and motions to compel arbitration: legal standards*

The Federal Arbitration Act (FAA), 9 U.S.C. § 1 et seq., provides that written provisions to arbitrate controversies in any contract involving interstate commerce[2] "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA thus establishes a liberal federal policy favoring arbitration, *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 665 (2d Cir. 1997), and "as a matter of federal law, any doubts concerning the scope of arbitrable

---

[2] The parties do not dispute that the purported contract at issue involves interstate commerce, and thus that the FAA applies to the present controversy.

issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

"Even where an arbitration agreement requires the arbitration of disputes involving a federal statute, the parties to a valid arbitration agreement are compelled to arbitrate 'so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum.' " *Kurz v. Chase Manhattan Bank USA, N.A.*, 319 F. Supp.2d 457, 460-61 (S.D.N.Y. 2004) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991)). Congress *may* override the presumption favoring arbitration agreements by inserting a contrary provision in a statute, but the burden of demonstrating that Congress intended to do so rests with the party opposing arbitration. *Bird v. Shearson Lehman/Am. Exp., Inc.*, 926 F.2d 116, 119 (2d Cir. 1991). "If such an intention exists, it will be discoverable in the text of the [statute], its legislative history, or an 'inherent conflict' between arbitration and the [statute]'s underlying purposes"; any doubts as to Congress's intent are resolved in favor of arbitrability. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991).

> The FAA also states in relevant part:
>
> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement.

9 U.S.C. § 3. Thus, while under the FAA a district court initially decides whether the parties

to a civil action agreed in writing to arbitrate a particular issue, once the court determines that they *did* agree to arbitrate the issue, the FAA gives the court no discretion: it *must* stay the proceedings and compel arbitration of the matter. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). However, where *all* of a plaintiff's claims are arbitrable, the court may dismiss the entire action instead of staying it, pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Lewis Tree Serv., Inc. v. Lucent Technologies, Inc.*, 239 F. Supp.2d 332, 340 (S.D.N.Y. 2002) (citing *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992) *and Seus v. John Nuveen & Co., Inc.*, 146 F.3d 175, 179 (3d Cir. 1998) (*overruled on other grounds*, *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79 (2000))).

Edge's motion, brought pursuant to Rule 12(b)(6), seeks to dismiss the entire action as arbitrable. As with any Rule 12(b)(6) motion, the court must read the complaint liberally, draw all inferences in favor of the plaintiff, accept the complaint's factual allegations as true, and dismiss only if it appears certain that the plaintiff can prove no set of facts entitling him to relief — or relief from arbitration. *See PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1197-98 (2d Cir. 1996).

> B. *Because Cortese has alleged that his contract with Edge is void, and has produced evidence in support of his allegation, he is entitled to trial on the arbitrability issue.*

Notwithstanding the strong presumption in favor of arbitration that it has created, "the FAA does not require parties to arbitrate when they have not agreed to do so." *Volt Info. Scis., Inc. v. Bd. of Trs.*, 489 U.S. 468, 478 (1989). "[B]efore a party can be required to submit

to arbitration, it is entitled to a judicial determination of the threshold question of whether it entered into an agreement which obliges it to consent to arbitration." *PMC, Inc. v. Atomergic Chemetals Corp.*, 844 F. Supp. 177, 181 (S.D.N.Y. 1994). Whether the parties agreed to arbitrate is generally determined by state contract law. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

According to Cortese, his "contract" with Edge violates the CROA, under New York law "contracts entered into in violation of a statute are illegal and unenforceable," and thus he cannot be compelled to arbitrate his dispute with Edge. Edge replies that, even assuming its agreement with Cortese violates the CROA, "the enforceability of the arbitration provision contained in the Agreement is not dependent upon the enforceability of the Agreement as a whole," because as a rule arbitration provisions are separable from the contracts in which they appear. Cortese is correct that he cannot be compelled to arbitrate at this juncture, although the reason lies in the text of the CROA itself, not New York law.

Edge bases its argument on *Prima Paint Corp. v. Flood Conklin Mfg. Co.*, 388 U.S. 395 (1967). In *Prima Paint* the Supreme Court held that in determining whether to recognize and enforce an arbitration agreement under the FAA, federal courts may only consider claims of "fraud in the inducement" as they relate to the arbitration provision itself, not as they relate more generally to the entire contract containing the arbitration provision. *Id.* at 403-04. Some courts read this holding broadly to say that "when the issues in dispute do not involve the making or the performance of the arbitration clause itself, the arbitration clause is to be enforced and the dispute submitted to arbitration." *See Javitch v. First Union*

9

*Securities, Inc.*, 315 F.3d 619, 628 (6th Cir. 2003). Such a reading would support Edge's argument.

But the Second Circuit has not interpreted *Prima Paint* in such a broad fashion. Instead, in addressing the separability of arbitration agreements, the Circuit has stressed "the distinction between void and voidable contracts," and has limited the *Prima Paint* holding to the latter. *Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26, 31, 31-32 (2d Cir. 2001).[3] Thus, "[i]f a party alleges that a contract is void and provides some evidence in support, then the party need not specifically allege that the arbitration clause in that contract is void, and the party is entitled to a trial on the arbitrability issue." *Id.* at 32. By contrast, "under the rule of *Prima Paint*, if a party merely alleges that a contract is voidable, then, for the party to receive a trial on the validity of the arbitration clause, the party must specifically allege that the arbitration clause is itself voidable." *Id.*

As Cortese asserts, it is well established in New York that contracts violating a state statute are void and unenforceable, *see*, *e.g.*, *Amdahl Corp. v. New York State Higher Educ. Servs. Corp.*, 611 N.Y.S.2d 50, 52-53 (App. Div. 1994), particularly "if the statute was enacted for the protection of the public against fraud." *See Chassman v. People Resources*, 573 N.Y.S.2d 589, 591 (N.Y. City Civ. Ct. 1991). But while "the question of whether an agreement is unenforceable because it is illegal is ordinarily determined under the state law

---

[3] "A void contract is one that produces no legal obligation"; a voidable contract, by contrast, is an agreement that "unless rescinded[,] imposes on the parties the same obligations as if it were not voidable." *Id.* (internal quotations and citations omitted).

that governs the contract in question, . . . [w]here an agreement contravenes a federal statute or regulation, however, the effect of such illegality is, at least initially, a question of federal law." *Dervin Corp. v. Banco Bilbao Vizcaya Argentaria, S.A.*, No. 03 Civ. 9141, 2004 WL 1933621, at *3 n.2 (S.D.N.Y. Aug. 30, 2004). In determining whether a contract that violates a federal statute is void, federal courts "often look to . . . whether the statute or regulation in question explicitly provides that contracts in violation thereof are void." *Id.*

The CROA was enacted to "protect the public from unfair or deceptive advertising and business practices by credit repair organizations." 15 U.S.C. § 1679(b). As indicated earlier, it states in part: "No credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed." 15 U.S.C. § 1679-b(b);[4] and the CROA mandates that "[a]ny credit repair organization shall provide any consumer" with a specific written disclosure statement "before any contract or agreement between the consumer and the credit repair organization is executed." 15 U.S.C. § 1679-c. Additionally, the CROA explicitly states that "[a]ny contract for services which does not comply with the applicable provisions of this subchapter (1) shall be treated as void; and (2) may not be enforced by any Federal or State court or any other person." 15 U.S.C. § 1679-f(c). This statutory language, read in tandem with the Rule

---

[4] Edge does not dispute that it is a "credit repair organization," that Cortese was its customer and a "consumer" under the definition of the statute, and that their agreement was a "contract" or a "contract for services" under the meaning of the statute.

12(b)(6) standard and the *Sphere Drake* holding discussed above, means that if Cortese alleges facts indicating that his Agreement with Edge violates provisions of the CROA, then Edge cannot compel arbitration, and he is entitled to a trial.

According to Cortese's complaint, "[t]he Defendant's uniform business practice is to charge fees, labeled as a 'retainer' in the contract, in advance of performing services, . . . and the Defendant did in fact charge the Plaintiff fees in advance of the performance of such services." (This contention is supported by the "Debt Melt Down Program Agreement Letter," discussed earlier, which states in part that "the first two [monthly] payments made by you into the program will be held by Edge Solutions, Inc. as a retainer. This retainer will be reimbursed back to you only upon successful completion of the program.") The complaint states that "[t]he Defendant fails to provide consumers with the [specified] disclosure as a matter of routine business practice," and suggests that Edge similarly failed to provide Cortese with such statement.

Because Cortese's complaint alleges facts that, if true, would void his contract with Edge for violation of the CROA, and because his allegations must be accepted as true on a motion to dismiss, dismissal is premature. Cortese is entitled to go forward in this forum to determine whether the Agreement actually violated the above-mentioned provisions of the CROA, and hence, whether it was void and unarbitrable. Edge's motion to stay or dismiss this case in favor of arbitration must therefore be denied.

  C. *Cortese's Other Defenses Need Not Be Addressed.*

As suggested in Part II.B, *supra*, a party may avoid contractually-mandated

arbitration by showing that the entire underlying contract is void, *or* by demonstrating the voidability of the arbitration clause specifically. Although Cortese attempts to do both, because the present motion must be denied on the basis of the former point, there is no need to address the latter.

*CONCLUSION*

For all of the above reasons, the Defendant's motion to dismiss or stay the proceedings is DENIED, and the Plaintiff's motion to submit an excess-length memorandum is DENIED AS MOOT.

**SO ORDERED.**

Dated: Central Islip, New York /s/
July 28, 2005 Denis R. Hurley
United States District Judge